The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except with the addition of Stipulation number 7, the addition of Finding of Fact number 16, and the modification of Conclusion of Law number 3 and other minor technical modifications.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between the defendant-employer and plaintiff.
3. The Associated Risk Services was the servicing agent on the risk for the defendant.
4. Plaintiff's average weekly wage is as set forth on the Form 22 Agreement.
5. Plaintiff was alleging an occupational disease on or about 10 October 1992 and 16 September 1993, resulting in an injury to her left shoulder.
6. Defendant-employer denied liability and the issue to be determined by the Commission is whether plaintiff, in fact, suffers from an occupational disease.
7. The deposition of Dr. Mason taken on 13 September 1994 and a packet of Stipulated Medical Records are hereby made a part of the evidentiary record.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner and find as follows:
FINDINGS OF FACT
1. Plaintiff is a 30-year-old female who began working for Lexington Furniture in July 1992. When she first began work, she was doing odd jobs which included sanding and taping drawers. Thereafter, she began working on the glaze wiping job. Plaintiff's job of glaze wiping involved different motions of her hands and arms. These motions included patting the furniture dry, brushing with a brush and a wiping motion. All the different motions of the hands and arms and the different duties involved minimal stress to the hands and arms. Furthermore, minimal use of the hands and arms was required for overhead movement. According to Mr. Hobbs, most of the furniture was either waist level or below the waist.
2. The majority of the furniture is waist high, approximately three to four feet high or lower with that measurement including the conveyor belt height. If a piece of furniture such as an entertainment center which is six feet tall requires overhead wiping, platforms are provided for the employee to stand on in order to avoid repetitive overhead use. Thus, plaintiff's job did not require repetitive overhead use of the hands and arms at varying heights according to the type of furniture and job that was being done.
3. When plaintiff began experiencing physical complaints of pain in her left shoulder, she was initially treated by Dr. Karl Bolstead. Plaintiff came under the care of Dr. Thomas Osteen, who diagnosed possible rotator cuff impingement syndrome.
4. After a course of conservative care that did not improve plaintiff's symptoms, Dr. Osteen operated on the left shoulder on 27 April 1993. At the time of the operation, plaintiff's pre-operative diagnosis was chronic impingement syndrome of the left shoulder. However, the operative findings indicated that plaintiff did not have an impingement syndrome or a rotator cuff tear, but indicated an anterior instability secondary to Bankart lesion of the left shoulder. Dr. Osteen surgically performed an arthroscopic examination of the left shoulder and an arthroscopic Bankart repair of the left shoulder.
5. Dr. Osteen subsequently provided post-operative treatment for plaintiff. On 19 October 1993, Dr. Osteen released plaintiff to return to work without restrictions. As of 8 November 1993, Dr. Osteen noted that plaintiff had a left shoulder condition that consisted of a tear of the anterior ligament of her shoulder and furthermore, plaintiff did not identify any specific injury.
6. Subsequent to plaintiff's release to return to work without any restrictions by Dr. Osteen, plaintiff came under the care of Dr. Mason. Dr. Mason first evaluated plaintiff on 1 November 1993. Dr. Mason diagnosed a possible tear of plaintiff's rotator cuff based on an arthrogram that was performed in February 1994. Based upon this diagnosis, he performed a rotator cuff exploration on 2 March 1994. The operative findings in the surgical exploration revealed that there was no significant rotator cuff tear and, in fact, plaintiff's rotator cuff looked good.
7. After the surgical exploration ruled out a rotator cuff tear, Dr. Mason finally diagnosed an acromial impingement syndrome and a tear in the subdeltoid bursa of the left shoulder. He found that there was no tear in the rotator cuff itself. This remained Dr. Mason's final diagnosis of plaintiff's condition.
8. Throughout the time that plaintiff was under the care of Dr. Mason, he was of the opinion that plaintiff could return to work with no lifting over her shoulders and with activity limited below her waist or no higher than the chest wall and neck area. These were the initial restrictions given on the 1 November 1993 visit. Dr. Mason confirmed that the same restrictions remained up until the time that he evaluated plaintiff in May 1994. In fact, the examination and physical findings with regard to plaintiff's left shoulder remained the same or improved while he was treating plaintiff. At the time of the May 1994 visit, plaintiff reported a new and completely different injury to her right shoulder. This injury occurred after plaintiff had returned to work at a job within the restrictions as prescribed by Dr. Mason. It was only after plaintiff had injured her right shoulder in a completely unrelated incident that Dr. Mason changed plaintiff's restrictions and limited her to sedentary work.
9. At the time of plaintiff's visit in May 1994, she had returned to work with defendant-employer at a job that was within her restrictions as prescribed by Dr. Mason with no lifting over her shoulders and work activity limited below her waist. In a meeting with Mr. Jim Tysinger, these jobs were specifically discussed with plaintiff. She was given the opportunity to choose from the jobs, and plaintiff picked job number 6 which involved auto-tailing sanding, or utility off-bearer.
10. Dr. Mason was of the opinion that plaintiff could perform a number of these jobs offered by defendant. Plaintiff returned to the job of auto-detailing sander or utility off-bearer and reported that she was doing the job fine until the incident with her right shoulder which is completely unrelated to her left shoulder condition.
11. On 13 June 1994, a meeting was held with plaintiff regarding her return to work. At that time she was offered a job and was told that any job she could do would be available to her, including the jobs that had earlier been shown to her and documented on Defendant's Exhibits 1 and 2.
12. Defendant-employer was willing to accommodate any restrictions of plaintiff. During the June 1994 meeting, the defendant-employer was made aware that plaintiff may only be able to do sedentary work. Sedentary work that was available to plaintiff included bagging hardware and placing screws and round pieces in bags, all that weighed less than 20 pounds. This job involved no reaching and no stretching as all of the materials were placed directly in front of plaintiff.
13. In the June 1994 meeting when Mr. Tysinger discussed the continued job availability for plaintiff, she stated that she was not going to work there anymore and refused to return to work. At that time, she was considered a "voluntary quit".
14. Dr. Mason specifically testified that, not only was he not familiar with plaintiff's job description, he was not sure what was causing her condition. When asked in his deposition what his opinion was with regard to the causation of plaintiff's condition, he specifically stated that he was "not sure".
15. There are 65 employees performing the job that plaintiff performed. No other employee has ever suffered a shoulder injury as did plaintiff.
16. There is insufficient evidence of record to find by its greater weight that plaintiff's employment with defendant-employer placed her at an increased risk of developing an occupational disease with respect to her left shoulder condition as compared to members of the general public not so employed. Furthermore, although plaintiff's diagnoses varied, the only diagnosis which is a specifically enumerated occupational disease therefore requiring no increased risk is bursitis. However, in this regard there is insufficient evidence of record to find by its greater weight that plaintiff's bursitis is causally related to intermittent pressure in her employment with defendant-employer.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. There are very specific evidentiary requirements to enable plaintiff to establish the compensability of an occupational disease. If the occupational disease is not specifically enumerated in the statute, plaintiff must prove that the occupational disease falls within N.C. Gen. Stat. § 97-53 (13). That is, "any disease which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade or occupational employment but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment." N.C. Gen. Stat. § 97-53.
2. The provisions of N.C. Gen. Stat. § 97-53 (13) require that a compensable occupational disease must meet three conditions, the first being that it is due to causes and conditions characteristic of and peculiar to the employment, secondly that particular employment conditions must place the worker at greater risk than the general public of contracting the disease, and thirdly, there has to be proof of a causal connection between the disease and the employment. Hansel v. ShermanTextiles, 304 N.C. 44, 283 S.E.2d 101 (1981).
3. Although plaintiff was diagnosed with bursitis, she has failed to prove a causal relation between her bursitis and her employment with defendant-employer. Furthermore, since plaintiff has failed to prove she was exposed to an increased risk as compared to the general public with regard to any of her diagnoses, she has not developed an occupational disease and is not entitled to benefits under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-53 (13) and § 97-53 (17).
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
AWARD
1. Plaintiff's claim for benefits for an occupational disease is, and the same shall be, hereby DENIED.
2. Each side shall pay its own costs.
 S/ ________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ ________________ BERNADINE S. BALLANCE COMMISSIONER
S/ ________________ COY M. VANCE DEPUTY COMMISSIONER